Slip Op. 08-80

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CONSOLIDATED FIBERS, INC., STEIN FIBERS, LTD., BERNET INTERNATIONAL TRADING, LLC, AND BMT COMMODITY CORPORATION, | Public Version |
| Plaintiffs, | Before: Leo M. Gordon, Judge |
| v. | Court No. 06-00134 |
| UNITED STATES, | |
| Defendant. | |

**OPINION**

[Plaintiffs' motion for judgment on the agency record denied; Commission's sunset review results sustained.]

Dated: July 22, 2008

deKieffer & Horgan (Gregory S. Menegaz, Merritt R. Blakeslee, J. Kevin Horgan) for Plaintiffs Consolidated Fibers, Inc., Stein Fibers, Ltd., Bernet International Trading, LLC, and BMT Commodity Corporation.

James M. Lyons, General Counsel, Neal J. Reynolds, Assistant General Counsel for Litigation, Karl von Schriltz, Attorney-Advisor, United States International Trade Commission, for Defendant.

Kelley Drye Collier Shannon (Paul C. Rosenthal, Kathleen W. Cannon, David C. Smith, Jr.) for Defendant-Intervenors Dak Fibers, LLC, Invista S.a.r.l., and Wellman, Inc.

Gordon, Judge: Plaintiffs move for judgment on the agency record pursuant to USCIT R. 56.2, challenging the final results of the United States International Trade Commission's ("Commission") five-year reviews of the antidumping duty orders on polyester staple fiber ("PSF") from Korea and Taiwan. See Certain Polyester Staple Fiber from Korea and Taiwan, Inv. Nos. 731-TA-825 and 826 (Final), USITC Pub. 3843 (Mar.

2006) ("Sunset Reviews").[1]  The court has jurisdiction to review Plaintiffs' claims pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2000)[2] and 28 U.S.C. § 1581(c) (2000).  For the reasons set forth below, the court sustains the Sunset Reviews and denies Plaintiffs' motion for judgment on the agency record.

## I. Standard of Review

In a sunset review the Commission determines whether revocation of an antidumping duty order would likely lead to continuation or recurrence of material injury within a reasonably foreseeable time.  19 U.S.C. § 1675a(a)(1).  Specifically, the Commission "consider[s] the likely volume, price effect, and impact of imports" on the subject merchandise if the order is revoked.  Id.  Additionally, the Commission takes into account its prior injury determinations, whether any improvement in the state of the industry is related to the order, whether the industry is vulnerable to material injury if the order is revoked, and any findings by Commerce regarding duty absorption pursuant to 19 U.S.C. § 1675(a)(4).  Id.

When reviewing the final results of the Commission's sunset reviews under 28 U.S.C. § 1581(c), the Court of International Trade sustains the Commission's determinations, findings, or conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

---

[1] The public views of the Sunset Reviews are cited as "Pub. Views" and the confidential views are cited as "Conf. Views."

[2] Further citations to the Tariff Act of 1930 are to the relevant provisions of Title 19 of the U.S. Code, 2000 edition.

§ 1516a(b)(1)(B)(i).  More specifically, when reviewing whether the Commission's actions

are unsupported by substantial evidence, the court assesses whether the agency actions

are reasonable given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d

1345, 1350-51 (Fed. Cir. 2006).

## II. Discussion

In this action Plaintiffs specifically challenge: (1) the Commission's "refusal to

conduct a thorough and impartial investigation" of the scope and effect of an alleged price-

fixing conspiracy amongst the domestic industry, and of its implications for the

Commission's original injury determinations, Pl.s' Mem. in Supp. of Mot. for J. on the

Agency R. ("Pl.s' Mem.") at 6-18; (2) the Commission's alleged failure to review the original

injury determinations as part of the analysis of the Sunset Reviews, Id. at 8-9 & 18; (3) the

Commission's finding that revocation of the orders would likely result in a significant

increase in the volume of imports of the subject merchandise, Id. at 19-27; (4) the

Commission's finding that revocation of the orders would result in adverse price effects,

including underselling and price depression or suppression by the subject imports, Id. at

27-29; (5) the Commission's alleged failure to examine the causation between future

subject imports and continuation of material injury upon revocation, Id. at 30; and (6) the

Commission's finding that imports of the subject merchandise would likely result in a

significant adverse impact on the domestic industry, Id. at 30-31.

## 1. The Integrity of the Sunset Reviews

Plaintiffs question the integrity of the Sunset Reviews, alleging that certain domestic

producers conspired to fix prices and allocate customers for the domestic like product

during a period overlapping parts of the original investigations and the <u>Sunset Reviews</u>.[3]

After examining Plaintiffs' allegations, the Commission determined that "any conspiracy

[amongst the domestic industry] was primarily limited to nonsubject PSF, and that record

evidence does not support the proposition that any conspiracy extended to certain PSF."

Pub. Views at 22.  The Commission concluded that the conspiracy did not affect the record

of the <u>Sunset Reviews</u> and declined to discount pricing data and other information from the

original investigations or the five year period following the publication of the orders ("period

of review" or "POR").  Pub. Views at 18, 22-23.

Plaintiffs argue the Commission failed to conduct a reasonable inquiry into their

allegations of price-fixing by not (1) drafting questionnaires that would elicit meaningful

information regarding the effects of the conspiracy, (2) subpoenaing documents from the

pending civil litigation regarding the conspiracy, (3) accepting two letter submissions

detailing evidence of the conspiracy until late in the <u>Sunset Reviews</u>, and (4) extending the

<u>Sunset Reviews</u> by 90 days to further gather and consider evidence regarding the

conspiracy.  Pl.s' Mem at 6-19.

The Commission maintains that it collected evidence relating to Plaintiffs'

allegations, including purchasers' responses to the Commission's questions about the

conspiracy, 1,823 pages of evidence submitted by the parties, hearing testimony, and

certain information gathered from a confidential source connected with the civil antitrust

_____

[3]  The court already heard Plaintiffs' separate claim involving the Commission's
refusal to reconsider the original injury determinations in light of new evidence of an
alleged antitrust conspiracy involving some members of the domestic industry.
<u>Consolidated Fibers, Inc. v. United States</u>, 32 CIT __, 535 F. Supp. 2d 1345 (2008)
("<u>Consolidated Fibers II</u>").

litigation.  Def.'s Resp. to Pl.s' Mot. for J. on the Agency R. ("Def.'s Resp.") at 20-23.  The

Commission contends that it had an ample evidentiary foundation on which to assess

Plaintiffs' antitrust conspiracy allegations.  Id.  The court agrees.

The court previously heard Plaintiffs' arguments about the sufficiency of the

Commission's inquiry into the alleged antitrust conspiracy in the court's review of the

Commission's refusal to conduct a reconsideration proceeding.  See Consolidated Fibers

II, 32 CIT at ___, 535 F. Supp. 2d at 1346-49 & 1352-59.  In Consolidated Fibers II,

Plaintiffs raised identical arguments that focused on the completeness of the record, none

of which the court found persuasive.  Id.  Here, as there, the conclusion is the same; the

Commission made "'active, reasonable efforts to obtain relevant data.'" Consolidated

Fibers II, 32 CIT at ___, 535 F. Supp. 2d at 1356 (quoting Allegheny Ludlum Corp. v.

United States, 287 F.3d 1365, 1373 (Fed. Cir. 2002)).

**2. Commission's Treatment of the Original Injury Determinations**

Plaintiffs also claim that the Commission violated 19 U.S.C. § 1675a by not

reviewing the validity of the original injury determinations as part of the analysis of the

Sunset Reviews.  Pls.' Mem. at 8-9 (citing 19 U.S.C. § 1675a(a)(1)(A)).  This argument

strikes the court as a thinly veiled attempt to continue to press for a reconsideration of the

original injury determinations, arguments that the court has already addressed in

Consolidated Fibers II.  Here, it suffices to say that section 1675a(a)(1)(A) does not require

a full blown reconsideration of the original injury determination underlying an antidumping

duty order being considered in a sunset review.  Instead, that provision simply requires the

Commission take into account its findings as to volume, price, and the impact of subject

imports before the order was issued.  19 U.S.C. § 1675a(a)(1)(A).  As the Statement of

Administrative Action accompanying the statute explains, the purpose of this inquiry is to

examine the most recent period of time in which subject imports competed without the

discipline of the order in place: "If the Commission finds that pre-order . . . conditions are

likely to recur, it is reasonable to conclude that there is likelihood of continuation or

recurrence of injury."  See Uruguay Round Agreements Act, Statement of Administrative

Action, H.R. Doc. No. 103-316, vol. 1, at 884 (1994), reprinted in 1994 U.S.C.C.A.N. 4040,

4209 ("SAA").

### 3. The Commission's Volume Analysis

In the Sunset Reviews the Commission determined that the volume of the subject

imports were likely to increase significantly upon revocation. Pub. Views at 24, 27.  The

Commission found that subject foreign producers were highly export-oriented during the

POR and that they maintained a significant presence in the U.S. market, even with the

orders in place.  Id. at 24.  The Commission also found that subject foreign producers

possessed substantial production capacity throughout the POR and ended the period with

significant unused capacity that could be used to increase exports to the United States.

Conf. Views at 35-37.  Additionally, the Commission found that the subject producers'

unused capacity in interim 2005 was equivalent to a percentage[4] of U.S. apparent

consumption in the same period.  Id. at 37.  Finally, the Commission noted that the record

showed that a number of antidumping duty orders had been imposed in Asia and Europe

during the POR, and that a rapidly expanding Chinese certain PSF industry was likely to

---

[4]  [[          ]]

push Korean and Taiwan exports out of the large Chinese market.  Pub. Views at 26.
Given these factors, the Commission concluded that the increasingly export-oriented
Korean and Taiwan producers were likely to bolster their flagging capacity utilization by
increasing their exports of subject PSF to the United States upon revocation.  Pub. Views
at 26-27.

### a. Margins

As their first challenge to the Commission's likely volume analysis, Plaintiffs argue
that the Commission's volume analysis was "fundamentally-flawed" because subject import
volume over the POR was inversely related to the dumping margins found in the
administrative reviews conducted by Commerce, suggesting, in Plaintiffs' view, that the
orders had no effect.  See Pls.' Mem. at 20-22.  Plaintiffs' argument contains a number of
legal and factual flaws.  First, Plaintiffs' claim that the orders had no effect on the subject
imports during the POR is incorrect.  As Plaintiffs themselves concede, imposition of the
orders had a disciplining effect on the dumping margins, nearly all of which fell significantly
during the first administrative review of the orders.  Id. at 21.  Similarly, although the
volume of the subject imports continued to increase during the first two years of the POR,
these volumes eventually fell with the orders in place, see Pub. Views at 24, thus indicating
that the subject producers were ultimately unable to continue selling the same volumes in
the market at non-dumped prices.  Given these two trends, the Commission concluded that
the orders did have an effect on subject import pricing and volume during the POR, which
is a reasonable conclusion.

Plaintiffs also claim that in analyzing likely import volume the Commission failed to properly weigh a trend of declining margins for subject PSF.  Although such a trend may be relevant to the Commission's inquiry, the statute does not mandate that the Commission give such a trend controlling weight.  See 19 U.S.C. §§ 1675, 1675a(a)(2). Rather, the Commission must also consider the margins Commerce calculates as likely to continue or recur upon revocation.   19 U.S.C. §§ 1675a(a)(6) & (c)(3), 19 U.S.C. § 1677(35)(C)(iv); see also SAA at 887, 1994 U.S.C.C.A.N. at 4211-12.  Although Plaintiffs may contend that the low or de minimis dumping margins calculated during Commerce's administrative reviews would likely continue, Commerce itself determined that dumping was likely to continue or recur at margins of 7.91% for Korean producers and from 3.79% to 11.50% for Taiwan producers, and the Commission properly considered Commerce's announced likely margins in its analysis. See Pub. Views at 29 n.207; SAA at 887, 1994 U.S.C.C.A.N. at 4212 ("The Commission shall not itself calculate or otherwise determine likely dumping margins . . . .").  Given this, the Commission's consideration of these margins, which were higher than those found in the administrative review results, was reasonable and consistent with the statute.

Moreover, despite Plaintiffs' claims, the Commission's finding that subject import volume was significant throughout the POR even with the orders in place is consistent with the Commission's finding that subject import volume will increase significantly upon revocation. See Pub. Views at 24.  As the Commission found, the fact that subject imports maintained a significant presence in the market even with the orders in place suggests that revocation of the orders would allow the subject foreign producers to increase their

presence in the U.S. market considerably once the orders and their disciplining effect no longer limited their ability to sell their products in the market at higher dumping margins. Id. at 24-27.  In other words, the Commission reasonably relied on the subject imports' substantial presence in the market as one factor supporting its affirmative volume finding, even though the subject imports were sold at low margins during the POR.

### b. PSF Capacity in Korea and Taiwan

Plaintiffs also argue that Korean and Taiwanese producers would be unlikely to increase their exports to the United States after revocation because there was likely to be strong global demand for PSF and there were different[5] average unit values ("AUVs") in third country markets as compared to the United States.  See Pls.' Mem. at 23-26.  The Commission, however, reasonably addressed and rejected each of these arguments.  With respect to strong global demand for PSF, the Commission observed that Korean and Taiwanese producers had suffered declining capacity utilization rates during the POR, even though there had been strong global demand over this period.  Pub. Views at 25-26 & n.189.  The Commission found that Korean and Taiwanese producers were operating at certain capacity utilization rates[6] in interim 2005, and their unused capacity[7] was equivalent to a percentage[8] of U.S. apparent consumption.  Conf. Views at 37.  Under

---

[5]  [[                        ]]

[6]  Korea's capacity utilization rate was [[          ]], while Taiwan's was [[          ]].
Conf. Views at 37.

[7]  The combined unused capacity was [[          ]] million pounds.  Conf. Views. at 37.

[8]  [[          ]]

these circumstances, the Commission reasonably determined that growing unused capacity of this magnitude was likely to place pressure on the subject producers to increase exports to the United States upon revocation of the orders, despite strong demand in the global market.  Conf. Views at 38-39; Pub. Views at 26-27.

With respect to the AUVs in other markets, the Commission noted that AUV comparisons were of little probative value for purposes of its analysis because there were differences in the product mix exported to different markets.  Pub. Views at 26 n.189.  As an example, the Commission cited the dramatic increase in the AUV of Korean and Taiwan exports to China over the POR that resulted from the expansion of Chinese producers taking market share of all but the highest-quality PSF sold in China.  Id.  The Commission found that the Korean and Taiwan producers' capacity utilization rates were declining, which suggested to the Commission that those producers would increase their exports to the U.S. market upon revocation.  Pub. Views at 25-27 & n.189.  On the issue of capacity, the court simply cannot discern any unreasonableness in the Commission's factual findings, or the conclusions that flow from them.

### c. Third Country Barriers

Plaintiffs also argue that the existence of third county barriers, like antidumping duty orders, will not trigger an increase in subject imports to the United States upon revocation because Korean and Taiwan producers have been able to trade in those markets in spite of those barriers.  Pl.s' Mem. at 23, 26.  To illustrate their point, Plaintiffs argue that a certain export market[9] has become the most important for [[

_____

[9]  [[                                    ]]

]] and there is no hard data record evidence of a barrier or restraint to this trend." Id. at 23.

The Commission did acknowledge that the subject producers' exports to that market had increased despite the imposition of an antidumping duty order. Pub. Views at 26; Conf. Views at 38-39. The Commission found, however, that this increase was more than offset by a substantial decline in the subject producers' exports to Asia, which were impeded both by new antidumping duty orders and the growth of the Chinese PSF industry. Id.[10]

The Commission found that the rapid expansion of Chinese PSF production had displaced Korean and Taiwan PSF exports from what had formerly been their largest export market. Pub. Views at 26. The record showed that subject foreign producer exports to Asia, including China, declined during the POR.[11] See Conf. Staff Report at Tables IV-6, 9, Certain Polyester Staple Fiber from Korea and Taiwan, Inv. Nos. 731-TA-825 and 826, (Feb. 15, 2006) ("Conf. Staff Report"), (CR[12] at Tables IV-6,9 (2-240)).  In response,

_____

[10]   The Commission also noted that although one Taiwan producer reportedly increased exports to [[                    ]] to compensate for the antidumping duty orders under review, the producer was likely to redirect these exports to the United States were the orders to be revoked.  Conf. Views at 38 n.188.  Because this subject producer had reported that the antidumping duty order under review had forced it to redirect its exports of PSF from the United States to [[                    ]], the Commission inferred that the producer would return to the status quo ante, exporting to the United States rather than [[                    ]], were the order to be revoked.  Id.

[11]   The decline was from a POR high of [[      ]] million pounds in 2001 to [[    ]] million pounds in 2004, and from [[    ]] million pounds in January-September 2004 to [[    ]] million pounds in January-September 2005.

[12]   Citations to the confidential documents of the Administrative Record are cited "CR" followed by the document number.

Plaintiffs argue that the Commission failed to consider that Korean and Taiwan producers were displacing their own exports to China by constructing PSF facilities in China.  Pls.' Mem. at 26-27.  The Commission, however, looked at PSF production in China and found that additional Chinese production of PSF would likely displace Korean and Taiwan PSF exports to the China market.  Pub. Views at 26.

The Commission ultimately determined that the imposition of these third country barriers and the rapidly expanding Chinese PSF industry had caused a significant decline in the subject producers' capacity utilization rates, and these producers would likely fill their unused capacity by increasing their U.S. shipments upon revocation. Pub. Views at 26-27. Such a conclusion, predicated on a detailed analysis of the effect of the growing Chinese production capacity and other obstacles in third markets, is reasonable.

### 4. Price Effects

Plaintiffs next challenge the Commission's finding of likely adverse price effects from subject imports if the orders are revoked.  Plaintiffs object to the Commission's consideration of pricing data from the original investigations as this data was allegedly distorted by the inclusion of higher-priced virgin PSF and lower-priced regenerated PSF within the same pricing products.  Pls.' Mem. at 28.  Plaintiffs also argue that the Commission's mixed underselling findings from the Sunset Reviews were tainted by comparing high end virgin PSF with low end regenerated PSF.  Id.

The Commission looked at the pricing behavior of the imports before the orders were imposed, and observed that pre-order subject imports undersold the domestic like product in 96.4% of pricing comparisons, by margins up to 78.2%, causing depression of

U.S. prices.  Pub. Views at 27.  The Commission then observed that a substantial degree

of substitutability exists between subject imports and the domestic like product, including

between virgin and regenerated or recycled PSF, with price being an important factor in

purchasing decisions.  Id.

Next, the Commission found that the pricing product data reflects a mixed pattern

of subject import underselling and overselling during the POR, even with the antidumping

duty orders in place.  Id. at 28.  The Commission noted that foreign producers are likely to

increase their instances and margins of underselling if the orders are revoked as a means

of recapturing U.S. market share.  Id.  Given the substitutability of the merchandise and the

importance of price to purchasing decisions, the Commission found that this increased

underselling would likely depress or suppress prices for the domestic like product.  Id.

Finally, the Commission observed that domestic producers would react to intensified

subject import price competition by either lowering their prices or relinquishing market

share, which would further depress the domestic industry's already low capacity utilization

rates.  Id. at 29.

Plaintiffs challenge the Commission's underselling findings from the original

investigations as erroneous in mixing virgin and regenerated PSF in its price analysis. Pl.s'

Mem. at 28.  As an initial matter, this argument is not properly before the court; it

challenges findings by the Commission in the original investigations, not in the Sunset

Reviews.  The court's jurisdiction over Plaintiffs' allegation of pricing errors is limited to

reviewing the Commission's findings in the Sunset Reviews, and does not involve review

of the Commission's findings from the original injury determinations.  See 28 U.S.C.

§ 1581(c) (2000); 19 U.S.C. § 1516a(a)(2)(B)(iii).  Moreover, Plaintiffs neglect to mention

that the original Commission findings as to interchangeability of various types of PSF,

including regenerated and virgin PSF, and the price effects of imports as set forth in its

original injury determinations were already sustained by the Court of International Trade.

See Far E. Textile Ltd. v. U.S. Int'l Trade Comm'n, 25 CIT 999, 1008 (2001) (sustaining

Commission's findings on interchangeability of various types of subject PSF based on

record data, and stating "the Commission's finding of a significant degree of

interchangeably for both conjugate and regenerated fiber is supported by substantial

evidence").

    Plaintiffs further contend that the Commission's underselling findings in the Sunset

Reviews were tainted by comparing "high end" virgin PSF with "low end" regenerated PSF.

At the request of respondents, the Commission segregated PSF made from virgin inputs

from PSF made from regenerated inputs in undertaking price comparisons in the Sunset

Reviews.   See Conf. Staff Report at V-7 (CR 2-240).   Thus, the Commission did not

compare prices of virgin PSF with prices of regenerated PSF in the Sunset Reviews.  Id.

Therefore, Plaintiffs are incorrect as a matter of fact in alleging that the Commission's

finding of underselling is explained by attenuated competition between virgin and

regenerated products.

### 5. Impact (Vulnerability of Domestic Industry)

    The Commission found that the domestic industry was vulnerable to the recurrence

or continuation of material injury according to numerous operational and financial

performance indicators. Conf. Views at 44-45. Respondents conceded during the reviews

that the domestic industry was vulnerable.  Pub. Views at 31-32.  Citing the domestic industry's condition and the substantial substitutability between subject imports and the domestic like product, the Commission concluded that if the antidumping duty orders were to be revoked, the likely significant increase in subject import volume and significant adverse price effects would have a significant adverse impact on the domestic industry within a reasonably foreseeable time.  Id. at 31.

Plaintiffs challenge the Commission's finding that revocation of the orders would likely have a significant adverse impact on the domestic industry as not in accordance with law.  Plaintiffs argue that "[j]ust as material injury must be caused by subject imports, the Commission is legally obligated to find 'probable' causation between future imports of Certain PSF and continuation of material injury or reoccurrence of material injury in the wake of the orders' removal," and that the Commission failed to establish this causation. Pl.s' Mem. at 30 (emphasis removed).   The Commission argues that no such legal requirement exists and that Plaintiffs' argument is a misguided effort to impose the causation requirement from the material injury context on the Commission's consideration of domestic industry vulnerability in sunset reviews.   Def.'s Resp. at 38.

Under section 1675a(a)(1)(C), the Commission considers whether the domestic industry is vulnerable to material injury in assessing the likely effects of revocation. 19 U.S.C. § 1675a(a)(1)(C).  The SAA recognizes that industry vulnerability may be caused by factors other than subject imports and instructs the Commission to consider the weakened condition of the U.S. industry in assessing whether injury will continue or recur if the orders are revoked.  SAA at 885, 1994 U.S.C.C.A.N. at 4210.

> The likelihood of continuation or recurrence of material injury standard is not the same as the standards for material injury and threat of material injury, although it contains some of the same elements.  Under the material injury standard, the Commission determines whether there is current material injury by reason of imports of subject merchandise. . . . By comparison, under the likelihood standard, the Commission will engage in a counter-factual analysis: it must decide the likely impact in the reasonably foreseeable future of an important change in the status quo – the revocation or termination of a proceeding and the elimination of its restraining effects on volumes and prices of imports.

SAA at 883-84, 1994 U.S.C.C.A.N. at 4209.

The Commission's task is therefore to determine whether revocation of the antidumping duty orders would likely result in the recurrence or continuation of material injury by reason of the subject imports within a reasonably foreseeable time, not to determine whether the subject imports significantly contributed to the decline of the domestic industry during the POR.   Because the antidumping duty orders under review imposed duties on subject imports equal to dumping margins over the POR, the existence of the orders generally makes it less likely that subject imports would be the source of any domestic industry vulnerability during the POR.   See 19 U.S.C. § 1673.   Thus, the Commission appropriately factored the domestic industry's vulnerability into its analysis of the likely impact of revocation in these reviews.

## III. Conclusion

The Commission's determination that revocation of the antidumping duty orders would likely lead to continuation or recurrence of material injury to the domestic industry within a reasonablely foreseeable time is supported by substantial evidence and in accordance with law.   Therefore, the court denies Plaintiffs' motion for judgment on the agency record on Counts 1 and 3 through 7 and will enter judgment in favor of Defendant sustaining the Sunset Reviews.

                                    /s/ Leo M. Gordon
                                    Judge Leo M. Gordon


Dated:    July 22, 2008
          New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CONSOLIDATED FIBERS, INC., STEIN FIBERS, LTD., BERNET INTERNATIONAL TRADING, LLC, AND BMT COMMODITY CORPORATION,<br><br>      Plaintiffs,<br><br>   v.<br><br>UNITED STATES,<br><br>      Defendant. | Before: Leo M. Gordon, Judge<br><br>Court No. 06-00134 |

**JUDGMENT**

This case has been submitted for decision, and the court, after due deliberation,

having rendered opinions; now in conformity with those decisions, it is hereby

**ORDERED** that Plaintiffs' motions for judgment on the agency record are denied;

and it is further

**ORDERED** that judgment is entered for Defendant.

            _/s/ Leo M. Gordon_
            Judge Leo M. Gordon

Dated: July 22, 2008
    New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of  the  court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.


Tina Potuto Kimble
Clerk of the Court


Date: _____     By: _____
                                                              Deputy Clerk